Good morning and may it please the court, Adam Wolfe for the Plaintiff Appellant Joan Friedenberg. I reserve four minutes for rebuttal. While it's plaintiff who brought the preliminary injunction motion, it really is the board that makes the enormous ask of this court to recognize an entire new category of jobs of government employees who can be subject to suspicionless searches. Whereas the Supreme Court has said that the judiciary must closely Let me ask you just a prefatory question. The entire category we're talking about is just school teachers rather than every employee. For our purposes today, it's even more narrow, your honor. It is only aspiring substitute teachers. And while the Supreme Court has said that the judiciary must closely guard any new such category of jobs, and almost all courts have refused to allow or to sanction such suspicionless drug testing of teachers, the school board here demands that millions of teachers be subject to suspicionless searches. In so doing, it is left to analogize aspiring substitute teachers to nuclear power plant Millions of aspiring substitute teachers in Florida? Not in Florida. I would imagine within the 11th Circuit itself, there are probably, it's not in the record. Across the country, certainly millions. We don't get to rule across the country, unfortunately. Fair enough. Maybe we could say 100,000, your honor. We know there are 3.2 million teachers in all in the United States. How many are substitute? I don't know. I don't know either. Break it down further, I don't know how many wind up in Palm Beach County. Correct. The record doesn't reflect that. It certainly does not, your honor. But the jobs of those who man nuclear power plant controls and who carry guns is far different from those of aspiring substitute teachers. Aspiring substitute teachers typically deal in chalk and erasers, not guns and chemical weapons. Unfortunately, we're reminded that sometimes they have to deal with guns. That sometimes what, your honor? They have to deal with guns. Absolutely, your honor. Your argument would have been easier to make five years ago. Can one imagine scenarios where students can be injured? Of course. Absolutely, you can. One can write a parade of horribles. Can one imagine scenarios in which a teacher, it's vital that a teacher be in full possession of his or her faculties and able to react and react intelligently? Yeah, that's what we're talking about. Absolutely. Now let's measure that against the legal standard. And what is the legal standard? It's not whether the employee has anything to do with safety. It's rather, as this court has said, whether the category of employment is, quote, an inherently dangerous job. No, it's not. It's the category of employment is whether there are safety concerns and special concerns in a school setting. The Supreme Court has said over and over and over again that school is different. And we're not talking about somebody working in a department store. Your honor, I was just quoting from LeBron, which is this court's opinion. It's 7-10 F-3-12-0-9. I think you're quoting out of the context of it. But in any event, LeBron didn't address this specific issue and doesn't bind us as to what the standard is for this specific type of case. So let's talk about what does bind you for this specific type of case, which is Chandler. And there, this court said that you can create a new category of employees who can be suspicionless drug tested only if they, quote, typically perform high-risk tasks. Typically perform. Let's accept, to begin with, that this case is different from an engineer driving a locomotive or an FDLE official carrying a firearm or somebody driving a school bus. Sure. That doesn't answer the question or the problem, though, because the issue here is whether one would create an additional category for teachers given the nature of the risk, the nature of the harm, the nature of the danger. That's right. And I want you to tell me why one wouldn't reasonably do that given the fact that students, parents hand their kids over to the teachers, to the schools who hold them a local apprentice, and the risks come up in manifest different ways. It's not simply because some lunatic walks into the school with a firearm and shoots the place up. The risk can be two kids get into a fight, you need a teacher to break it up quickly. Someone pulls a knife, you need a teacher to respond quickly. A student is allergic to peanut butter and someone has peanut butter and jelly for lunch and he goes into anaphylactic shock and boy, you better respond quickly or the kid's dead. Student has strep throat, temperature soars to 104 and you need to respond and get him home or get him to a nurse quickly. The natures of risk are different than someone who's drunk driving a locomotive, but the risks are palpable here. The dangers are palpable even if they are of a different category than slamming a locomotive into an automobile. And what I want you to tell me is why this doesn't fit squarely within this kind of concern. About teachers being responsible for the safety and safety concerns that can be attended in schools, I have two children. My parents were teachers. I very much understand this. The legal answer is that we are dealing here with an exception, this is the legal answer, an exception to the Fourth Amendment's main rule, which is that you have a warrant and individualized suspicion. And so there's a very closely guarded exception to that main rule and the courts are supposed to jealously guard that, okay? And so the standard, as I said to Chief Judge Carnes, is that the employee must quote, typically perform high risk tasks. That is not the case with teachers, not the typically part. I see it's all in how you frame the question. You frame it in terms of high risk tasks. I framed it in terms of protecting the integrity and safety of students. And so, and I think- Is that high risk? Well, not in the sense of a firearm or a locomotive moving at 80 miles an hour. Correct. But it's high risk in the sense that there's palpable danger at every turn in a school. And you've got a problem if that teacher is drunk or stoned, it seems to me. And I want you to tell me why that isn't enough in this context to create this special need for this category. Of course, because we are not writing here, and this is the factual part of the answer, right? So I started with the standard, and the factual part of the answer is that we're not writing on a blank slate. We have 108 years of history with the 13th largest school district in the country. And what has that shown us? That not once in the 108 years has there ever been a problem. Supreme Court and our court have said that doesn't matter. And besides, you don't know if there's been a problem or not. Well, that's in the record and it is their burden. No, it isn't in the record. It isn't. It can't be in the record. You never know how a teacher would have reacted had the teacher been of a different mental state, or emotional state at the time. You never know when there's been a tragedy in the past where some kids had an attack in the school and didn't make it, or didn't make it without severe injury. You never know whether the student, the teacher, was as alert and clear thinking as the teacher could have been. That's not a controlled experiment. We don't have a laboratory. You can't say there's never been a problem. What we do know is that it is their burden to show the special need, and they have not come up with a single example. Well, the Supreme Court has never required a special need in any of the school drug testing cases. It has required a special need in the government employee test. No, we're not talking about it. We're talking about a school context. You can't take this school substitute teacher testing case out of the school context. Supreme Court has said significantly, this court has previously held that special needs inherit in the public school context. Central in our view to the present case is the fact the subjects of this policy are, number one, children, who have, number two, have been committed to the temporary custody of the state as the schoolmaster. The most significant element in this case is that the policy was undertaken in furtherance of the government's responsibilities on the public school system as guardian and tutor of the children entrusted to their care. The unique environment of the public school setting, over and over and over again, Supreme Court has told us schools are different. That is true when we are talking about the standards relating to constitutional rights of students. Shouldn't be any different when you're talking about teachers who have been entrusted with the care and protection of those children. If you hear, if a teacher hears shots and has seconds to react, are the children going to be safer if the teacher is clear-headed and not under the influence of drug or alcohol? Are they going to be safer if she's stoned? If that is a question, I will readily admit that it is when the teacher is not intoxicated. It unfortunately is the question because the school system has the right, and I think balancing has the right under the Fourth Amendment, to guarantee to the maximum extent they can that these teachers are clear-headed and thinking clearly throughout the school day when there are children under their care and protection. I understand that, Your Honor. I absolutely do. And it all comes back to what is the standard that the Supreme Court has set down, which is that their typical duties of the employee in question, the typical duties must involve high-risk tasks. Let me ask the question to follow up on what Judge Carnes asked you. Here you have a case that goes to the Supreme Court any student in an extracurricular activity can be randomly tested for drugs. I'm not even talking about student-athletes now. Correct. That was Earls. Isn't the interest even more compelling here than there? Isn't the interest, the special need here, a more compelling one for a teacher to be clear-headed than for testing? I mean, if you can test every student for extracurricular activities, essentially you can test every student, period. That actually is not true. Do you think there's a difference? The only cases that have ruled on that issue have held an all-student policy unconstitutional. That is in a footnote in our reply brief. Why isn't there a more compelling interest for teachers than even students in extracurricular activities? It's just the constitutional standard is entirely different, that adults have a robust set of rights. And that is our starting point. Let's talk about the robust set of rights that a teacher has in a school. Aren't the privacy interests different? Teacher goes into a school, don't they have diminished privacy expectations insofar as we look at their belongings, their purse, their bags, their lockers? A little bit different in a school setting, isn't it? For teachers? Yeah. I don't believe so. You don't think so? You think that a teacher is not subject to any more intrusive invasion of a purse or a bag in a school than, say, she might be in some other area? No, Your Honor, for two reasons. One, the legal standard is very different there. In a case like TLO, the court was very clear that the issue there was the student's personal rights, and moreover, when this court has been looking at the privacy rights of employees and looking at whether they have a diminished expectation of privacy, the court has looked at, quote, the physical and bodily invasions. Let me come at it slightly differently. The Sixth Circuit suggested that when a person enters into the educational profession, they do so with the understanding and expectation that the profession itself is heavily regulated as to the conduct expected of the people in the field, that education is regulated in a very different kind of way, much more pervasively, and that, too, creates a diminished expectation or ought to. I think the Sixth Circuit got that wrong. In my opinion, that is completely untethered from Supreme Court doctrine. Yes, I do think it got it wrong. First of all, the standard is physical or bodily invasions of privacy, not state regulation more generally. And what the Sixth Circuit was saying in Knox is that there are a million state regulations that cover education. That undoubtedly is true. There are also a million regulations that cover politicians and judges and DAs. The Supreme Court of the United States has recognized that government employees in an industry that's regulated pervasively may have a lessened interest of privacy. That admittedly comes up in Skinner, which is a different context. I accept that. But the general observation seems to me maybe to have some legs to it. And if it doesn't, tell me why not.  In the Skinner case, it said regulated for safety. Right. OK, there is nothing in the record that teachers are regulated for safety. Zero. And again, that is not our burden to show that. Let me ask you the last question for me. It's more of a statistical or an empirical question, please. In this record, is there any data that's extant about likelihood of finding an applicant, substitute teacher, will test positive for drugs or alcohol than someone else? Is there any data here? You're talking about substitute teacher versus other applicants? Or more generally, teachers in general or applicants to the school in general. I don't know. What kind of data do we have here? Yeah, we do have a set of data from one full year, which is what the school district gave us. And what that showed is that a meager 0.67 percent of the people who applied tested positive. That is way, way, way below national averages. To what extent is that because of self-selection? If you know you're going to be tested, you say, well, I'll put it off. I got a cold. Let's do it next week, the week after. If you're drunk, then you're not going to be drunk the next day, let alone a week later. If you're stoned, you may not be a week later and the body may metabolize the drugs quickly. Is that part of a problem in terms of looking at this data and finding something meaningful in it? That very well could be part of the problem. As the district court stated, one could just count backwards. Let me just say, my time is way up. It sure is. Why don't we bring it to a close? I'll give you four minutes on reply. Thank you, Your Honor. Mr. Fahy. Good morning, and may it please the court. My name is Sean Fahy. I'm here today with Shontoya Bernard. We represent the School Board of Palm Beach County, Iapoli in this case. Every school day, families entrust the safekeeping and the tutelage of children of the nearly 200,000 children to the teachers and the substitute teachers who are employed by the School Board of Palm Beach County. Substitute teaching, which is the particular focus today, is a unique job, and it is one that presents important and specific safety concerns. On the one hand, the School Board vests these substitute teachers temporarily with all of the critical responsibilities Your Honors have been discussing of its full-time teachers. These include, to name just a few, the duty to detect and report student health issues, the duty to detect the use or possession of dangerous and illegal drugs by students, and the duty to detect the possession of weapons by students. And also the duty to respond to emergencies. Absolutely, Your Honor. And at all times, to speak to my colleague's comment about whether this is a typical duty of a substitute teacher, at all times, substitute teachers are responsible for ensuring the safety of the students in their care. In order to fulfill these critical responsibilities, it is of the essence, it is essential that substitute teachers be of sound and sober mind and able to respond appropriately at all times. The entire analysis here is essentially probabilistic, isn't it, to the extent that we're worried about a risk and a danger and we're trying to put something down prophylactically to eliminate the risk or danger. That's essentially the task we're about, isn't it? I believe that is correct, Your Honor. Okay, so if that's what we're about, what reason, how likely is it, how much evidence do we have of substitute teachers coming to work either drunk or stoned? In our record... Seems to be pretty, it's certainly not impossible, it's unlikely if not remote. Would that be a fair characterization? I don't believe our record answers your question. Well, he cites to the evidence for one year and he says, if you look at the data, the positive testing was 0.67. It was less than 1% and that was for the whole category, not just for substitute teachers, but for janitors or whatever. Correct, and five of those employees were substitute teachers within that subset of 30 people. And your answer also that the only way to really get any accurate information on how many teachers come to school stoned each day would be surprise test. And nobody's done that. I mean, if you tell somebody, great, we like your application, first next month we're going to give you a drug test, they can get clean for a period of time on most drugs and show up, pass the test, and then be stoned the first week in school. And that wouldn't show up in anybody's data and anybody's record, would it? That is perhaps true. It sounds to me like your honors are asking about the efficacy of this sort of pre-employment test as compared with... No, I'm not. I'm asking about how you can possibly say this many teachers show up under the influence of drugs or alcohol if you don't do surprise testing. The most that I understand you to be talking about is how many people flunk the pre-announced scheduled in advance screening test. I'm not talking about the efficacy of those tests. I'm just talking about the absence of any surprise testing to get a grip on how many folks are under the influence. The only source we would have to gather that kind of data would be whatever reasonable suspicion testing in our schools might present. But as we've explained... One other way you would look, you would look retrospectively and ask, is there any reporting of any incident? If so, how many over five years, 10 years, 20 years in Palm Beach County? I mean, one theoretically could look and say, how many teachers have been sanctioned or censured for apparently coming to work drunk or stoned? And if they come to work drunk, that will be evident to other people in the school. Do we have any data on that? We do not. About whether there was any recorded incident over five years, 10 years, one year of teachers being sanctioned for being drunk on the job. We did not produce evidence of that being a problem. No, we did not. And I have to assume that if there was some data, you would have presented that front and center. I mean, I would certainly present that if I had it. That is correct, your honor. We would have. I mean, we would certainly... That doesn't mean the danger isn't real. I'm just talking about probabilities here. So the first question about probability, it seems to me, is how likely is it that a teacher or substitute teacher is going to come in drunk or stoned? Answer, we don't know from the data because it really doesn't help us for all the reasons we've talked about. But historically, there's no pattern that we can point to suggesting that's an issue. Is that a fair statement? That is, but we would supplement that statement by saying the purpose of a prophylactic testing... So I understand. I understand what the purpose is. So then the second part of probability, it seems to me, would be you would look at how common the danger would be, the kinds of risks that we're talking about. And there, that may be harder to quantify, but these emergencies can come up in a lot of different ways. And then we'd ask, so how likely is it that a stoned teacher is going to face a student who's gone into shock because he touched peanut butter? Seems to me, the numbers are small, but that doesn't answer the question because the last part of the analysis is what's the gravity of the harm? And so we would look at probability and gravity. And when it comes to gravity, though, that's where your risks can go off the charts, right? Absolutely, Your Honor. But at the end of the day, the risks he argues are essentially so small that it can't be used on this record to justify so massive an intrusion, because if you're right, he says, you can drug test 3.2 million teachers regularly on the front end to get the job and on the back end when they have the job. That's what he says. At least I think that's the essence of what he's saying. I'll respond to one small point in Your Honor's question. You said a massive intrusion. But it's actually the testing protocol the board uses is actually minimally intrusive under the Supreme Court. You don't think it's intrusive to say, here's the cup. Go in the bathroom. We're standing right out there with you. And by the way, we're going to search all your bags, et cetera, before you go in. Certainly recognize that as a Fourth Amendment intrusion. It's enough of an intrusion. I mean, it depends on whose eyes we're talking about, how big an intrusion it is. But that's an intrusion. It's enough of an intrusion to qualify as a search, yes. Certainly does. But the Supreme Court has described it. Is it more intrusive than looking in my bag? It reveals. I go watch the Miami Heat three blocks from here. I go into the American Airlines arena. I got to open up my bag. Everybody does it to walk in. I go through a magnetometer. But they actually look in my bag. Is the nature of that intrusion different from them saying, Marcus, here's a cup. Go into the bathroom. Give us a sample. I can't answer your question with a reference to precedent in the sense of whether a court has said the search of a bag before entering a building for safety concerns is more or less intrusive than providing a urine sample. What I can say is that the provision of a urine sample, the procedures we use for that provision have been described by the Supreme Court. The only reason I raised it is I'm simply saying if the likelihood of the harm is exceedingly remote and unlikely, although real, and the nature of the intrusion is substantial and it cuts across a large enough class and we're obliged to make some kind of holistic balance, how do we come at that problem? Well, the court would look to. Is it enough to say if you save the life of one kid in 3,000 school districts, by God, that is enough? No, I'm just asking. We would say that is enough. If you do say that's enough, how do you weigh the fact that there was at least some surveillance? I mean, the urine testing is a part of this surveillance. But it's not as if the teachers are unsurveilled. They usually come in, as I understand it, about 15 minutes before and talk to the administrators and talk about the day and so forth. And if they are visibly impaired, at least enough to give rise to suspicion, presumably there's going to be action taken. And substitute teachers are checked. The record shows that they are maybe not routinely, I mean, not always checked, but they are often by principals and other teachers poking in the classroom during the day. So we can say there's a great risk that needs observation. But then we have to balance against that, the observation that is provided. And then we have to say, is more needed? So don't you think we, at least in the calculus, have to take into account some of this other surveillance that does occur? Absolutely, Your Honor. Essentially, the point of the balancing inquiry is ultimately to determine whether to dispense with the default rule of individualized suspicion. And so what the Supreme Court— Well, the default rule is not to test. I mean, the default rule is that there is a very strong, very strong constitutional preference against warrantless searches. Yes, Your Honor. So we're attempting to learn whether this policy will serve a purpose that would not already be served by ordinary law enforcement or relying on an individualized suspicion regime. And so there are two points that are critical to that. The first is that the Supreme Court has said that when an employee can cause a great risk of harm before his or her signs of impairment would become noticeable to others, that presents the interest that's jeopardized by requiring individualized suspicion. Can I pause just a minute there? When you say when the employee is responsible for the harm, I was a bit struck by the analogies that most of these cases postulate about harm risk. Very few of the postulated harms result from the teacher doing something to injure the child, unlike the security, the border INS people who could themselves cause the harm or the engineer on the train who himself could cause the harm. There's one extra degree of remoteness here that is not present in those other precedents. That is, the harms that are mostly postulated here are harms that other people cause. They talk about fighting in the school ground and taunting and the school kid eating something and choking. And then it isn't that the teacher caused the harm. It is the teacher. So you've got two-step causation. Something else happened that was independent of the teachers being stoned or not. And then the teacher, secondarily, was he or she a quick responder. Does that make the harm more remote by adding one extra degree of causality into the factor? It may add a degree of attenuation, Your Honor. And does the Supreme Court use... I'm asking this because I really don't remember the answer. Does the Supreme Court qualify the degree of harm? Do they use adjectives like substantial or likely? Or is the harm in the school context unadjectived, unqualified? The key terms the Supreme Court has used are concrete danger, substantial and real risk to public safety. Concrete, we can deal with. We say, yeah, that's not something that the Martians are going to land or something. But do they ever quantify it by likely or not likely? I'm sure they don't use that. Do they ever use words like substantial or real or anything like that? Substantial and real, yes, Your Honor. But the real is real and immediate interest, is it not? I thought in the Earls that was the phrase they picked up from the respondents and addressed. Real and immediate interest to justify a policy of drug testing non-athletes, the extracurricular case. So the court will analyze the nature and immediacy of the government's interests in the balancing inquiry. But in terms of the school board meeting, it's burden of production to show a substantial need. But isn't it relevant here that if you looked at, in the case of railway workers driving locomotives, Supreme Court's ready with data. There's no question. There were so many accidents caused over a certain period of time, so many deaths attributable to misconduct on the part of somebody driving a locomotive. And yet when it comes to schools, the adjectives and adverbs may be there, but the data sure isn't. So if you look at the extracurricular activity of students, there's no data, right? Correct. And so when we're assessing- I mean, they're words. There's substantial, meaningful, real, concrete, but all stated at a high order of abstraction and utterly untethered from data. That would be a fair statement, wouldn't it? I wouldn't agree that it's stated at a high level of abstraction. We believe we've shown that the danger is concrete in the specific context of substitute teaching, the context of teaching, being responsible for the safekeeping of children. The problem is the danger is real but unlikely. That's the point they're making. And if it gets remote enough, then you've got a tall order to justify doing away with the requirement of the Fourth Amendment and reasonable suspicion. There is a degree of speculation- How do you respond to while there is a risk, the gravity of the harm can be extraordinary. It can be life or death for a child. And the parent has turned that child over to the school for safekeeping. But the risk is small in the sense of probabilities. But the harm can be enormous. We don't accept that the risk is small. We accept that there is not data showing that this has happened. But we point- Don't you think that's relevant? That there is no historical data to suggest a problem with stoned or drunk teachers walking into Palm Beach County over the last one year, two years, five years, 10 years, 20 years? Isn't that relevant? We don't think so because we point the court to Von Raab and we do so with the understanding that the Supreme Court later told us that that was not- Right, but Von Raab is different. There you're talking about customs officials who are armed with firearms involved in drug interception work. We all agree schools are different. That case is just- It's not very helpful here, is it? We just- We think it is. Why? We think it gives the governing framework. And obviously, Chandler complicates the matter a bit in how we use Von Raab. But what Von Raab says is you can look at a context and even absent evidence of a drug problem, even absent evidence that drug-impaired employees have caused the feared harm, you can look at the context. And admittedly, with a degree of speculation, you can recognize an obvious risk in the context. And so when the risk is obvious from the context, if an impaired customs official would obviously perhaps fail to intercept drugs coming into the country or might use a firearm, then you can conclude that there is a valid government interest in installing a prophylactic testing regime without offending the Fourth Amendment. We submit the same is true in schools because the concrete danger is apparent and obvious. Let me ask the question slightly differently. Does a teacher or an applicant for a job in a school have a more diminished interest of privacy? And maybe someone else in a different forum? And if the answer is yes, why? The answer is yes for at least one reason. The nature of the work itself should signal to somebody seeking to hold the job that his or her fitness and judgment is paramount and he or she should expect a potentially physical or bodily inquiry into his or her ability to discharge those responsibilities. The second point, which we did not brief in an attempt to be faithful to how we read this court's precedent in 2013, Scott decision with respect to physical or bodily privacy being the inquiry is whether the industry is closely regulated. And Your Honor asked about that. And we would submit that certainly public schools, I don't think my colleague would dispute this, are heavily regulated. There are regulations in place, legal regulations in place to provide that schools have to be safe. And that makes it clear that public schools are regulated for safety. And so potentially for that reason as well, and again, we only relied on the first reason in our submissions to the district court or to this court following the decision in Scott. But that second point is true here as well, to the extent it is relevant. But if you rely on heavy regulation, then would this precedent from us that you're seeking also apply to nursing homes? Anybody working in a nursing home can be required to give such tests and other people that have any potential supervisory responsibility over people that might be a little less capable of taking care of themselves, such as school children. I mean, how far does the rule go that you would articulate for us? Well, if the court's concerned about a limiting principle, it has two Supreme Court cases that have specifically, in addition to many others, but two Supreme Court cases specifically in the context of drug testing that have specifically talked about- They do. But interestingly, in those cases, the testing was of the student, not of the teacher. And they were saying that a student who is stoned, it seems to me that a student who is stoned has a significantly greater risk of destructive behavior. We all know that the control area of the human brain doesn't develop very well until after adolescence. And we also know that the studies show that drug use is far more dangerous and destructive for adolescents and younger than it is for mature adults. So it seems to me that it's not green martians that we're worrying about, but it is certainly a significant step forward to say that because students can be tested given their normal unpredictability and impulsiveness anyhow, and saying that's a direct precedent, the Supreme Court would accept about teachers being tested. Do you agree with that? I'm not saying that you wouldn't say that it shouldn't be so extended, but do you agree that it would be a significant extension in our case? And that's why it's important to rely on it for the specific purpose we're dealing with today, which is that the court has articulated in those cases that the school context places a hefty weight on the school board's side of this inquiry. And that's what we use those cases for. And of course, the inquiry is whether the need is substantial enough to outweigh the privacy interests at issue. And yes, the privacy interests in those cases, no question, of children committed to the schools are diminished. But admitted to the school by compulsion of state law. Correct. I mean, let's don't overlook the fact that the parents, except in the rare instance in which it's practical and financially possible for them to do at-home schooling, are required to entrust their children to these people by law. They can be punished and sent to jail if they don't do so. Absolutely, Your Honor. And that is why this school context is so critical, because that means that the school board, which is imposed with that duty and responsible for taking care of those children, has a compelling interest in providing a safe school environment. And substitute teachers form a crucial part of that environment. Thank you, Mr. Fay. Thank you. Mr. Wolf, four minutes. Let me ask you how you deal with this. And this is from Earl's. An assertion of special need for suspicionless general search program can be shored up by evidence of a problem. But a demonstrated problem of drug abuse is not in all cases necessary to the validity of testing regime. Furthermore, this court has not required a particularized or pervasive drug problem before allowing the government to conduct suspiciously drug testing. Drug abuse is one of the most serious problems confronting our society today. It would make little sense to require a school district to wait for a substantial portion of its students to begin using drugs before it was allowed to institute a drug testing program designed to deter drug use. Does it make any sense to require a school system to wait until a child has been harmed or perhaps killed as a result of a substitute teacher being on drugs or alcohol before allowing that school system to institute such a program? It's a simple yes or no. Not simple yes or no, but it's a yes but or no but. You asked two questions that I promised to get to both of them. Well, how about getting to them right now and then I promise you you can add your qualifications. That's fine. Is it appropriate for the district to wait? Is that your question? Right, until there's been harm to a child because of drug or alcohol abuse by a teacher. It's not the standard, your honor. No, no, I'm asking you. Well, it's... Can we require a school system to wait until a child is harmed because of drug use or alcohol abuse by a teacher before the school system can do this? Your honor, it doesn't have an easy yes or no. I can't. Give me a hard yes or no count. Then my answer would be under the case law, yes. Okay. That's fine. I appreciate your candor. I appreciate the question because the Chief Justice Rehnquist in Chandler asked that very question. He said, do we have to wait until there is some, you know, drug-addled politician to make some crazy decisions? The answer should have been, how could we ever tell the difference? I mean, we're not talking about taking care of school children in the legislature. No, but what we are talking about is calling in the National Guard in a state of emergency, declaring states of emergency. We're talking about signing off on clemency petitions or signing the wrong clemency petitions. There are great safety-sensitive jobs. Everything you've just listed, example, and I get your point and there are examples, but those are all executive functions and nobody was going to drug test the governor. Yes. The governor was at issue in Chandler, your honor. I thought Chandler was the legislature. The governor was one of the positions, your honor. And the reason that the Chief asked that question is, and when the Chief asked that question, he was the only one who asked it because he asked that in dissent. He was a one-person dissent in Chandler. It was an eight-to-one decision, your honor. Nobody else was concerned with that question. What I will tell you is that it does come, and I appreciated the colloquy that was going on here before. The context is critical, isn't it? It absolutely is. It's of a very different species or character when you're talking about students falling between K and 12. You have five-year-old kids going into school for five hours. I have a three-year-old. That's very different from what you're talking about in Chandler, isn't it? You think Chandler is the same context as what we're talking about here? It's absolutely a different context, your honor. Okay. So let's focus on this context. That is perfectly fine. And so if you look at a case like the Kanawha County case in the Southern District of West Virginia, which looked at this very issue, and the court there, too, was wrestling with, what is concrete? What is hypothetical? What is real? And all these sort of words that you were discussing with my friend across the aisle here. And what the court ended up doing was going to the dictionary definition and says, well, it's characterized by immediate experience of realities. That's what the court was looking at there. I want to ask the question this way. Why isn't it enough to fairly say that even if the probabilities are small, the gravity of the harm is awesome and in a school context, that ought to be enough to do away with a requirement of probable cause for testing on the front end for someone who voluntarily chooses to say, I want to enter this profession and teach and care for these children? Sure. Because the probability is just so darn low, your honor. And that's what the record reflects. Right. But the harm can be so great. Absolutely. And so, you know, it's like... What you're really trying to do is compound the probability against the harm to come out with some kind of idea of risk. That's what one always does in Fourth Amendment cases. I argued a Fourth Amendment case before the Supreme Court, and you were looking at sort of the degree of the invasion versus the likelihood of finding the material or contraband there. And it is always a sort of balancing, if you will. Right. But I'm asking in this precise context, where the gravity of the harm can be so substantial. Yes. Even if the probability is small. Yep. Don't you lose anyway? No, because you always need a great amount... Grave, serious harm has to be part of the question. That is, in the Supreme Court case law, what you then need to look at is, well, how likely is that? So that has to be a given. Grave, serious harm... Correct. ...to students who are in school because the law compels that. Correct, Your Honor. Parent must turn them over. And so what we know here is we talk about what is hypothetical, right? Is that, and this is the board's burden to carry, is that there has not been a single incident in 108 years. What we know is that the longest serving employee of the board who was deposed said he had never, ever in his career seen a teacher who was intoxicated on drugs in school. That he knew of. That he knew of. That's all we can have here, Your Honor. People can blow a .08 on a photoelectric intoxometer or the successor machines... Absolutely. ...and walk a straight line and do the alphabet backwards, but that doesn't mean they can do it as well as if it was .00. I understand, Your Honor. I hear that and let me... See, and the other part of the problem that you have is, while it may be more evident that someone is or is not drunk from breath, from glassy eyes, from slurred speech, the use of controlled substances is very different and it depends on the pharmacology of the drug. The body metabolizes so much more quickly than others, but you'd be amazed at how difficult it is to discern. So you say even if you had 15 minutes when they walk in the door, they might have had a heavy night of cocaine and it would not necessarily be evident when they walked in the door, you know, eight hours later. I understand that, Your Honor, and we're not saying that everybody necessarily is detected during that observation. What we are saying is that there is... I'm suggesting to you that in many instances, it's exceedingly difficult and unlikely that you could detect it simply from the walking in and say, Hey, Joe, how are you? I had a great night. I went to see the Miami Marlins. They actually won a game. That would be hypothetical. And they were actually... Boy, is it hypothetical. Yeah, I have one last point and then I'm done, which is we have not talked about the efficacy as it relates to Ms. Friedenberg particularly. She has been granted a potentially years-long time to wait before she goes in for a drug test. I am not aware of a single case in the history of American jurisprudence where that has ever occurred and where that has been deemed an important interest that is vindicated when... All you got to do is go into court, get an injunction, and after a month or so say an efficacy has run out. That ain't going to fly on counsel. It's only because the board has put her in this position, Your Honor. No, it's only because she got a stay, a delay. Granted by the board. Yeah, but she insisted on it so she could litigate this case, which is what she's done. She didn't insist on the stay, Your Honor. Well, OK. Thank you very much, Your Honor. You're welcome. Next case up is Sigmund versus...